943 So.2d 720 (2006)
Eddie JACKSON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-01508-COA.
Court of Appeals of Mississippi.
June 27, 2006.
Rehearing Denied December 5, 2006.
*721 Richard B. Lewis, Clarksdale, attorney for appellant.
Office of the Attorney General by W. Glenn Watts, attorney for appellee.
EN BANC.
BARNES, J., for the Court.
¶ 1. Eddie Jackson was convicted in the Circuit Court of Bolivar County of the May 20, 2002 murder of Vicky Pruitt and aggravated assault of Charles West. Following his conviction, Jackson was sentenced to a term of life imprisonment for the murder, and to a term of ten years for the aggravated assault, with the sentences to run concurrently. On appeal, Jackson argues that the State's evidence was insufficient to establish his guilt beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence, and, further, that he received ineffective assistance from his appointed counsel. We reject these contentions and affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. At 10:03 on the night of May 20, 2002, the Cleveland, Mississippi, police department received a call regarding a double shooting near a residence located at 824 South Parkway. Officers arrived to find Vicky Pruitt slumped in the front passenger seat of a Chevrolet Suburban parked partially on the sidewalk, and Charles West, the owner of the residence, lying in the driveway. The injuries proved fatal to Pruitt, but West survived. At 10:14 on the same evening, the Bolivar County Sheriff's Department received a call that the appellant, Eddie Jackson, was shooting at an apartment complex located at 900 White Street, which was located between 60 and 150 yards from the site of the Pruitt/West shootings. Deputies soon arrived at the scene, where they took Jackson into custody.
¶ 3. During the course of the ensuing police investigation, Davion Walker, a resident of the 900 White Street apartment complex, informed police that he had taken *722 two guns from Jackson prior to the deputies' arrival, and that he had hidden the guns when he heard sirens. After the deputies left, Walker retrieved the guns and took them to Jackson's brother, Tracy. The next day, Tracy delivered to his other brother, Michael, a box containing the two guns. Soon thereafter, Michael dumped the box into Jones Bayou, located just south of Boyle, Mississippi. Michael later led the police to that location, and after two days of searching in the water and mud, officers retrieved one gun, a silver Bryco Jennings automatic (.380) with a black handle, which was established by expert testimony to be the gun which fired the bullets taken from Pruitt's body at autopsy. The second gun was never located. Expert testimony established that West was shot with a different gun from that which killed Pruitt.
¶ 4. Jackson was ultimately tried and convicted of the murder of Pruitt and of the aggravated assault of West. On appeal, Jackson contends that the evidence was insufficient to establish his guilt beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence. His primary claims are that the time line of events on the night of May 20 excludes him as the shooter of Pruitt and West, and that the murder weapon was never proved to be in his possession at the time of the shooting. He further contends that a reasonable hypothesis consistent with his innocence would be that Bartholomew Burns had motive and opportunity to commit the crimes. In order to analyze these contentions, we have reviewed the record in detail.
¶ 5. Burns testified that on the night of May 20, he drove from Mound Bayou to Cleveland to rent a motel room, which he did on occasion when he intended to stay out later than his parents left their house unlocked. Pruitt, a family friend, asked if she could ride with him, and Burns assented. As he drove into the parking lot of the Best Western motel, Burns noticed a man wearing a light-colored shirt stretching near a blue Oldsmobile Cutlass. Burns testified that when he entered the motel to register, he saw "probably . . . that person" walking in the direction of his Suburban. Burns testified that the registration process took approximately ten or eleven minutes, and that when he went back outside, he discovered that his Suburban was gone. Thinking that Pruitt might have gone to get something to eat, pick up her friends, or that she might be playing a prank, Burns telephoned his friend, Wautese Bell, to come get him. The two drove back toward Mound Bayou, checking at all of the fast food restaurants to see if Burns's vehicle was present. They also attempted several calls to Burns's cell phone, which he had left inside the Suburban. Officer Charles "Buster" Bingham, a criminal investigator with the police department, who had found the phone during the course of his initial investigation, answered one of these calls. He instructed Bell and Burns to come to the scene of the shooting immediately, and they complied. Bell and Burns were subsequently taken to the police department for questioning and gunshot residue tests. Bell corroborated Burns's testimony regarding the events which occurred from the time he received Burns's telephone call. Bell approximated the receipt of that call somewhere between ten minutes until 10:00 p.m. and shortly after 10:00 p.m.
¶ 6. A gunshot residue test performed on Burns showed that one particle of gunshot residue was present on the back of his right hand; however, no gunshot residue was found on Bell's hands. David Whitehead, a forensic scientist with the Mississippi Crime Laboratory, testified that one particle is "not a lot of residue," and that he would expect a person who has fired an *723 automatic weapon and revolver several times to have residue on the back and palm of the hand from which the weapons were fired. Further, Whitehead testified that it is possible for gunshot residue to be transferred to another person by an officer who has handled shell casings. The record in this case established that Officer Bingham had photographed the crime scene, including the casings, and had extracted one projectile from the lattice work at West's house prior to his interview with Burns.
¶ 7. Police also performed a gunshot residue test on Jackson some two days after his arrest; the test showed Jackson's hands to be free of gunshot residue. Whitehead testified that once a mere four hours have passed between the discharge of a weapon and the administering of a gunshot residue test, there will probably not be any gunshot residue detected. Furthermore, Whitehead stated that he would "absolutely not" expect gunshot residue to be present on the hands of someone who was not tested until two days after the discharge of a weapon.
¶ 8. As to the time line of events on the night of May 20, Officer Bingham testified that during the course of investigating Burns's account of the evening, Bingham went to the Best Western motel and learned that Burns had registered at the motel at 10:00 p.m.[1] The 911 call reporting the shooting of Pruitt and West was made at 10:03 p.m., and was placed by one of West's neighbors contemporaneously with the shooting. At 10:14 p.m.,[2] the Bolivar County Sheriff's Department received the call complaining of Jackson shooting at the 900 White Street apartment complex, which was located some 60-150 yards from the site of the Pruitt/West shootings.[3]
¶ 9. Jackson arrived in Cleveland by bus at approximately 7:00 to 7:25 on the evening of May 20, having come from Detroit. He was met at the station by his brother, Tracy, and friends Durance Gee and Carl Hollingsworth. Hollingsworth gave Jackson a half pint of Remy Martin-brand cognac, which Jackson had asked him to purchase. The men proceeded to the Best Western motel in order for Jackson to rent a room; the motel records reflect that Jackson registered at 7:31 p.m. During the course of Jackson's unpacking, the three other men observed Jackson with gun(s) and/or ammunition. Tracy testified to having seen two boxes of ammunition and two guns: a rusty-colored revolver and a chrome pistol; Gee testified to having seen one box of ammunition and one gun, a silver automatic; and Hollingsworth testified to having seen two boxes of ammunition. Both Tracy and Gee admitted that the gun offered into evidence as the murder weapon "look[ed] like" the gun they saw in Jackson's room on the night of May 20. The men then left the motel to pick up a blue Cutlass for Jackson to drive, and proceeded to a liquor store where Jackson *724 purchased an additional half pint of cognac. The men then visited the home of Tracy's girlfriend for approximately twenty to twenty-five minutes. Gee and Hollingsworth departed together at approximately 7:50 to 8:15 p.m., leaving the blue Cutlass for Jackson's use. Jackson left at approximately the same time, while Tracy remained at his girlfriend's home.
¶ 10. At some point during the evening, Jackson went to visit his own girlfriend, Gechabarski Scott, at her mother's house. Scott was unaware until Jackson arrived that he had come to Mississippi. He was "drunk" and accused Scott of lying to him. After he "shoved" and "pushed" Scott, she and her mother told him to leave. Scott described Jackson as "upset" when he left, and testified that she heard the car door slam and the tires squeal as "he burned away in the car." Scott testified that Jackson left before the ten o'clock news came on. "[A]bout ten minutes after [Jackson] . . . left," Scott received a phone call from a friend, Linda Ramiz, who lived at 900 White Street,[4] advising that Jackson "had been over there and burst some windows out." Ramiz stated that "it sounded like a gun. . . ."
¶ 11. Walker testified that Jackson arrived at his apartment at 900 White Street "anywhere from about 9:00 to 10:00, somewhere up in there."[5] Walker came from the back room to find Jackson standing in the living room waving a gun. Walker "reacted" and "charged him," taking from Jackson the rusty-colored revolver. Jackson next pulled out another gun, a chrome automatic, which Walker also took away after some "tussling." Walker testified that Jackson "acted like he had been drinking or something." Walker heard sirens and, not knowing what had happened, took the guns to the Shady Grove Park across the street and hid them. When Walker returned to the apartment, a deputy had Jackson in handcuffs. As soon as the deputies left, Walker retrieved the guns and took them to Jackson's brother, Tracy.
¶ 12. Tracy testified that while he was watching a basketball game on television, Hollingsworth's girlfriend called to report that Jackson was at the White Street apartments "acting a fool." He did not remember what time he took the call, but stated that the ten o'clock news had not yet come on television. Tracy arrived at the apartment complex "[a]bout five or ten minutes later" to find a couple of police cars and several people standing around. Walker took Tracy back to his girlfriend's house and later delivered to Tracy the two guns which Walker said he had taken from Jackson. Although it was dark, Walker testified, he thought the two guns "looked similar" to those he had seen in Jackson's possession earlier while in the motel room. Tracy put the guns in a box in the closet, and gave them to his other brother, Michael, the following evening. As mentioned above, Michael then dumped the box into Jones Bayou.
¶ 13. During the course of the investigation, Jackson informed Officer Bingham that Scott had purchased one of the guns at the "A to Z Pawn Shop." The officer reviewed the gun log book at the shop and discovered that a .380 had been sold to Scott. He obtained the serial number of *725 that gun and matched it to the gun recovered from Jones Bayou. Scott testified that the gun belonged to Jackson and that she had pawned it and picked it back up at his request.[6] Furthermore, Scott testified that she had last seen the gun in Jackson's possession. On September 20, 2002, Scott executed a notarized statement claiming that the gun had been stolen from her apartment in February 2002. However, on the witness stand, Scott testified that the notarized statement was false, and that she had signed it, at Jackson's request, "to help him out" because she "didn't want anything to happen to him."

STANDARD OF REVIEW
¶ 14. Requests for directed verdict and peremptory instruction challenge the sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). Their standard of review is identical. Hawthorne v. State, 835 So.2d 14, 21(¶ 31) (Miss.2003). The key question in this analysis is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss. 2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Furthermore, where a case is based purely on circumstantial evidence, we must also determine:
whether a rational fact finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged. Put another way, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt."
Shields v. State, 702 So.2d 380, 382 (Miss. 1997) (citations omitted) (quoting Clark v. Procunier, 755 F.2d 394, 396 (5th Cir. 1985)).

ISSUES AND ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN DENYING JACKSON'S MOTION FOR DIRECTED VERDICT AND IN REFUSING HIS REQUEST FOR A PEREMPTORY INSTRUCTION.[7]
¶ 15. As stated above, on appeal, Jackson contends that the evidence was insufficient to establish his guilt beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence. Primarily, he claims that the time line of events on the night of May 20 excludes him as the shooter of Pruitt and West; he also claims that the murder weapon was not proved to be in his possession at the time of the shooting.
¶ 16. As support, Jackson primarily cites Walker's testimony that Jackson arrived at his apartment before 10:00 p.m. and did not leave until after Walker heard sirens. This, Jackson argues, proves that he was at Walker's residence "before and during" the shooting of Pruitt and West, which was reported at 10:03 p.m. However, Walker's testimony is not nearly as precise as Jackson would have this Court believe. *726 While Walker testified that Jackson arrived "anywhere from about 9:00 to 10:00, somewhere up in there," he also admitted that he "wasn't just looking at no clock." Jackson further cites the testimony of Walker's girlfriend, Shwanda Turner, that Jackson was at the apartment before the ten o'clock news. When asked whether the news had come on, Turner's actual response was, "I don't know. I don't think so. I don't remember." Additionally, Turner could not recall whether she and Walker had been watching "regular TV or cable." Walker, in fact, had testified that the couple had been watching a movie on their VCR. We do not find that the record supports any correlation between Jackson's arrival at Walker's apartment and the timing of the ten o'clock news.
¶ 17. The only testimony even suggesting that Jackson arrived at the 900 White Street complex prior to the 10:03 p.m. shooting of Pruitt and West is Walker's estimation of the time of Jackson's arrival. Walker admittedly was not looking at the clock. We find that a jury could reasonably conclude that, in light of the other evidence, Walker's estimate had to be incorrect, and that Jackson did not arrive until after 10:03 p.m. A later time is more in keeping with Walker's remaining testimony that after he had taken the two guns from Jackson, he heard sirens, hid the guns across the street, and returned to find Jackson in the custody of deputies. The call to the sheriff's department was not made until 10:14 p.m.[8]
¶ 18. More importantly, Walker's testimony establishes that two guns  a rusty-colored revolver and a chrome automatic  were in Jackson's possession at the time he entered the apartment, and that they remained in Jackson's possession until after 10:14 p.m. By this time, the shootings of Pruitt and West had already occurred. The jury might reasonably conclude, beyond a reasonable doubt and to the exclusion of every reasonable hypothesis to the contrary, that the chrome automatic taken from Jackson by Walker was the murder weapon. The jury was presented with evidence that the serial number of the automatic matched the serial number of a weapon retrieved by Scott from A to Z Pawn Shop; Scott's testimony that the automatic belonged to Jackson and that she had seen it in his possession in Detroit; and testimony from both Tracy Jackson and Durance Gee that they saw a chrome or silver automatic which looked like the murder weapon in Jackson's motel room mere hours before the shooting.
¶ 19. Jackson's hypotheses that the automatic was not in his possession during the murder are conflicting and unreasonable. He claims the State proved that his brother Tracy had possession of the automatic at the time of the murder. The evidence is uncontradicted, however, that Tracy did not gain possession of the automatic until some time after the deputies had taken Jackson into custody, which occurred after 10:14 p.m. Again, by this time, the murder had already taken place. Further, Jackson claims that "there is no doubt that the only people that positively had that murder weapon in their possession w[ere] Michael Jackson and Tracy *727 Jackson." There is, however, no evidence that Michael or Tracy had any gun other than those taken from their brother by Walker and transferred to them after the shootings. Jackson's hypothesis that Michael must have stolen the gun from Scott in February is not supported by any evidence in the record and is palpably unreasonable. We find nothing in the record to support any reasonable hypothesis that any person, other than Jackson, was in possession of the murder weapon at 10:03 p.m.
¶ 20. Second, Jackson contends that a reasonable hypothesis consistent with his innocence would be that Bartholomew Burns had motive and opportunity to commit the crimes. No one testified to the exact distance between the Best Western motel and 824 South Parkway, the site of the Pruitt/West shootings; accordingly, we are unable to determine whether it would have been physically possible for Burns to have completed registration at 10:00 p.m. and shot Pruitt and West by 10:03 p.m. However, Jackson has not hypothesized any motive Burns might have had for the shootings or any way the murder weapon might have fallen into Burns's possession and later end up in Jones Bayou.
¶ 21. Third, Jackson claims that he should be acquitted of the aggravated assault on Charles West as West was unable to identify his assailant, no gun was ever found which matched the bullet recovered from West's shoulder, and "the only gun linked to [Jackson], the Jennings .38 did not fire the projectile recovered from Mr. West." While a second gun was proved to have been used in the shooting of West, there is no evidence that a second person fired those shots. Tracy Jackson testified that the defendant had two guns, a chrome automatic and a rusty-colored revolver, in the motel room prior to the shootings, and Walker testified that he took guns of a similar description from Jackson and hid them when he heard sirens. The evidence of other witnesses would time those sirens as having occurred shortly after 10:14 p.m. Both Tracy Jackson and Carl Hollingsworth testified to seeing two boxes of ammunition in Jackson's room prior to the shooting. The police retrieved two boxes of ammunition from the motel room after the shooting, one box of .380 ammunition and one box of .38 plus "B" bullets. Under these circumstances, a jury could reasonably find, beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence, that Jackson was guilty of both shootings.
¶ 22. Fourth, Jackson points to the fact that no fingerprints were recovered from the crime scene, and that no blood spatters or gunshot residue were found on his person. Jackson contends that the lack of physical proof connecting him to the crime proves that he did not commit the murders in question. However, expert testimony adduced at trial established that such evidence would not necessarily be produced by the crime in question.
¶ 23. Kenneth Gill, admitted by the court as an expert in the field of fingerprint examination and analysis, testified that it was true that he found no fingerprints "of value" on either the shell casings recovered from the crime scene, or the silver Bryco Jennings automatic (.380) recovered from Jones Bayou. However, Gill testified on cross-examination by the State that he would not expect to find latent prints on either spent casings or a gun that had been submerged in water. As to the former, Gill testified that the "enormous heat and friction" caused by a gunshot removes any print that might have been present on the cartridge prior to the *728 shot.[9] As to the latter, Gill testified that when a gun is submerged in water, the water, mud, and dirt work to remove any print residue that might have been present on the gun prior to being placed in the water.
¶ 24. In addition, Dr. Stephen Hayne  admitted by the trial court as an expert in the fields of anatomical, clinical, and forensic pathology  testified that, while it was possible that the killer would have been splattered by blood during such a shooting, such a result would not necessarily occur. Further, as mentioned supra, the lack of gunshot residue present on Jackson's hands is not necessarily indicative of his innocence, as he was not tested for residue until two days after the shooting, at which point any residue would have disappeared. Taken together, the above expert testimony strongly contradicts Jackson's assertion that the lack of physical evidence produced by the State necessarily proves his innocence.
¶ 25. Lastly, Jackson points to the fact that the motel record indicated that someone entered his room with a room key at 10:31 p.m., at which time he was already in custody of the Bolivar County Sheriff's Department. Jackson has not indicated how this fact could possibly exonerate him of the crimes. The record reflects that two keys were issued to Jackson, but there was no testimony as to whom Jackson gave the second key. The only evidence which was retrieved from the motel room were two boxes of ammunition, which two witnesses had seen in the room earlier in the evening; accordingly, we do not see that any evidence used against Jackson could have been the subject of tampering.
¶ 26. Taking all of the evidence into consideration, we find that a rational juror could easily find that the State proved the elements of the crime of murder beyond a reasonable doubt, and to the exclusion of all reasonable hypotheses consistent with innocence. This issue is without merit.
II. WHETHER JACKSON WAS AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL.
¶ 27. Jackson sought to represent himself at trial, and his request was granted by the trial court. However, in order to aid Jackson in his efforts, the trial court appointed Attorney Boyd Atkinson to act as Jackson's legal adviser. It is apparent from the record that there was a great deal of dissension between Jackson and Atkinson, and in several instances, Jackson and Atkinson argued with each other while in the presence of the jury. The disagreements apparently stemmed from the conflict between Jackson's desire to relegate Atkinson to the role of passive observer, and Atkinson's desire to assist Jackson so that he did not "self-destruct" and "make a mockery and butcher up the case." Interestingly, on appeal, Jackson has reversed course. While Jackson, at the trial level, asserted his status as lead counsel and sought to minimize Atkinson's role, Jackson now claims that Atkinson did not do enough to assist him at trial. We marvel at this paradox.
¶ 28. Jackson contends that Atkinson's performance was so deficient as to deny him the right to a fair trial. Specifically, Jackson claims that he was prejudiced by trial counsel's failure to (a) file motions for laboratory testing of certain alleged exculpatory evidence; (b) request an alibi instruction; and (c) interview witnesses or otherwise investigate in order to determine *729 the whereabouts of the blue Cutlass at the time of the shooting. Furthermore, Jackson claims that trial counsel's failure to heed his directives resulted in a number of disputes that took place before the jury, thus prejudicing his defense. Our review of the record shows that Jackson's contentions are without merit; however, as we find below that Jackson is barred from asserting a claim of ineffective assistance of counsel, we find no need to evaluate the substance of his claims.
¶ 29. Faced with similar circumstances as those currently before this Court, we recognized in Scarbough v. State that, "It has been established by the Mississippi Supreme Court that as stand-by counsel, a defense attorney is `without authority, discretion or control and the charge that he rendered constitutionally ineffective assistance is without merit.'" Scarbough v. State, 893 So.2d 265, 273(¶ 27) (Miss.Ct. App.2004) (quoting Estelle v. State, 558 So.2d 843, 847 (Miss.1990)). Furthermore, we noted that "Estelle held that where a defendant declines appointed counsel and proceeds to represent himself with appointed counsel only standing by to provide assistance if called upon that the defendant will not be heard to complain on appeal of ineffective assistance of counsel." Id. It is clear that Scarbough and Estelle are directly applicable to the present controversy. As Jackson voluntarily assumed the role of trial counsel, he may not claim that his adviser failed to provide him with adequate representation. Simply put, Jackson may not now benefit on appeal from his own ineptitude at trial. This issue is without merit.

CONCLUSION
¶ 30. It is clear from our thorough examination of the record that Jackson's claims are wholly without merit. We therefore affirm the judgment of the Circuit Court of Bolivar County.
¶ 31. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I MURDER AND SENTENCE OF LIFE; AND COUNT II AGGRAVATED ASSAULT AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH SENTENCE IN COUNT II TO RUN CONCURRENTLY TO SENTENCE IN COUNT I AND CONSECUTIVELY TO ANY AND ALL SENTENCES PREVIOUSLY IMPOSED, PAY $1,400 IN RESTITUTION IN COUNT I AND $9,000 IN RESTITUTION IN COUNT II, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] The motel computer listed the time for Burns's registration as 22:07. Officer Bingham, however, correlated the motel clock with police dispatcher's clock and discovered that the motel clock was seven minutes faster. The time used in the text reflects this correlation.
[2] Officer Bingham testified that the call to the sheriff's department was received at 10:17 p.m. However, Deputy Walter Grant testified, referring to his report, that the call was received at 10:14 p.m. The text reflects Deputy Grant's testimony which provides the more compressed time line for the events in question.
[3] One investigator with the Cleveland police department, Melvin Sparks, testified that the distance was "no more than 60 to 70 yards." Another investigator, George Serio, stated the distance to be 150 yards, which could be jogged in about one minute or walked in "a few minutes."
[4] Officer Bingham testified that when Jackson was questioned, he admitted that he had come to Mississippi to "beat up" a subject that was at 900 White Street because this subject had not allowed him to speak with his girlfriend when he called.
[5] In response to questioning by defense counsel "trying to get the time as close as you can," Walker stated, "That's been a long time ago, man." He had previously admitted, "I wasn't just looking at no clock, man."
[6] The records of A to Z Pawn Shop showed that the gun was pawned by Scott on June 25, 2001 and picked up by her on August 3, 2001.
[7] Jackson also contends that the trial court erred in denying his motion for JNOV or, in the alternative, new trial. The record does not reflect, however, that any post-trial motions were ever filed. As will be addressed in our discussion of Jackson's claims of ineffective assistance of counsel, Jackson insisted upon serving as his own counsel in this case.
[8] Jackson claims that his alibi is "further solidified" by the testimony of Scott, who stated that Jackson left her mother's house just before 10:00 p.m.; she remembered the time, she testified, because the news "was coming on" when Jackson left. Jackson argues that since the house was "a good distance away from the crime scene," he could not have committed the crimes at 10:03 p.m. We have been unable to locate any testimony in the record regarding the distance from the house of Scott's mother to the Best Western motel or the crime scene. In any event, we do not regard Scott's testimony regarding timing of the events as so persuasive to create a reasonable hypothesis of Jackson's innocence.
[9] Further illuminating as to the issue of fingerprint evidence was Scott's testimony that Jackson had once taught her to load cartridges into a gun using her shirt, thus eliminating the possibility of leaving latent prints on the cartridges.